The **UNITED STATES,** Appellant,

v.

**INTERNATIONAL BUSINESS MACHINES CORPORATION,**
Appellee.

No. 89–1357.

United States Court of Appeals,
Federal Circuit.

Dec. 20, 1989.

Rehearing Denied Jan. 17, 1990.

---

Grant G. Moy, Jr., Gen. Counsel of the U.S. Government Printing Office, Washington, D.C., argued for appellant.

William J. Kolasky, Jr. of Wilmer, Cutler & Pickering, Washington, D.C. argued for appellee. With him on the brief was Peter A. Von Mehren of Wilmer, Cutler & Pickering. Of counsel were Robert F. Salvia and Bryan Lewis, of the Intern. Business Machines Corp., Bethesda, Md.

Before MARKEY, Chief Judge, and BENNETT, Senior Circuit Judge, and MAYER, Circuit Judge.

## OPINION

MAYER, Circuit Judge.

The Government Printing Office (GPO) appeals the decision of the General Services Board of Contract Appeals, granting the

protest of International Business Machines Corporation (IBM) to the award of a contract to another bidder on a GPO invitation for bids. *International Business Mach. Corp.*, GSBCA No. 9703–P, 89–1 B.C.A. (CCH) ¶ 21,389 (1988). We affirm the board's decision that it had jurisdiction to hear protests of GPO's conduct of the solicitation, reverse its decision that IBM had standing to file a protest, and vacate its decision on the merits.

### Background

GPO formally advertised Invitation for Bid No. 1337888 on June 10, 1988. The sealed-bid solicitation originally specified an IBM 3084 Model Q64 or IBM 3084 Model QX6 brand name "or equal" central processing unit (CPU); it was subsequently amended at least seven times, Amendment No. 3 deleting the restriction "air cooled systems are not acceptable." This allowed vendors to bid the Amdahl 5880 CPU, which is air cooled. GPO received ten bids in response to the solicitation. With the exception of Amdahl Corporation (Amdahl) to whom, as the lowest bidder, GPO awarded the contract, every vendor bid the same IBM product configuration. PacifiCorp Capital, Inc. (PacifiCorp) and Federal Systems Group, Inc. (FSG) submitted the second- and third-lowest bids, respectively. IBM's bid was fourth-lowest.

Although both PacifiCorp and FSG complained to the GPO contracting officer that his determination on the responsiveness of Amdahl's bid was incorrect, only IBM filed a formal protest with the board. FSG and Amdahl thereafter intervened in the protest, FSG in support of IBM's position and Amdahl in support of GPO's. GPO argued that the board had no jurisdiction to entertain IBM's protest because Congress had provided GPO with a continuing exemption from the Brooks Act in the 1977 Legislative Branch Appropriations Act, Pub.L. No. 94–440, 90 Stat. 1439 (1976). Alternatively, Amdahl alleged that IBM lacked standing to protest the award because IBM was not an "interested party" within the meaning of the Brooks Act. 40 U.S.C. § 759(f)(9)(B) (Supp.V 1987).

The board rejected both of these arguments. It ruled that the 1977 Appropriations Act "and its legislative history fail to indicate an intent to extend the exemption beyond the applicable year of the Appropriations Act" and that the 1986 amendments to the Brooks Act, legislatively "overruling" *Electronic Data Sys. Fed. Corp. v. General Serv. Admin. Bd. of Contract Appeals*, 792 F.2d 1569 (Fed.Cir.1986), "fully confirm [that] determination." 89–1 B.C.A. (CCH) ¶ 21,367, at 107,702. The board also held that because IBM had participated in and expended resources in an effort to obtain this procurement, it had a direct economic interest in, and therefore standing as an "interested party" to protest, the award of the contract to Amdahl. *Id.* at 107,704. The board affirmed this aspect of its decision on reconsideration, adding:

> [I]f the protest is granted, a reprocurement to meet GPO's actual requirements could be in order. IBM has alleged that if it had been on notice that GPO was soliciting offers for a less powerful processor, it would have attempted to offer a less powerful, less expensive processor. Presumably, it would do so in any resolicitation. Accordingly, IBM's direct economic interest would be affected by the award of the contract.

89–1 B.C.A. (CCH) ¶ 21,372, at 107,718. The board then granted IBM's protest and ordered GPO to terminate its contract with Amdahl. *Id.* ¶ 21,389. GPO appeals.

### Discussion

■ *A. Jurisdiction.* The Brooks Act gives the Administrator of the General Services Administration the authority to coordinate and regulate the "purchase, lease, and maintenance" of automated data processing equipment (ADPE) by federal agencies. 40 U.S.C. § 759(a)(1) (1982). The parties here agree that GPO is a "federal agency" for purposes of the Act and that the solicitation was for the purchase of ADPE. The sole jurisdictional issue is whether the exemption from the Brooks Act granted GPO as part of the 1977 Legis-

lative Branch Appropriations Act extended beyond fiscal year 1977.*

We agree with the board that the language of the 1977 Appropriations Act does not evince a congressional intention to give GPO a continuing exemption from the Brooks Act. The relevant language is:

> The Government Printing Office is hereby authorized to make such expenditures, ..., as may be necessary in carrying out the programs and purposes set forth in the budget for the current fiscal year for the "Government Printing Office revolving fund": ... *Provided further,* That during the current fiscal year the revolving fund shall be available for the hire of two passenger motor vehicles and the purchase of one passenger motor vehicle: *Provided further, That funds available to the Government Printing Office may be expended to purchase, lease, maintain and otherwise acquire automatic data processing equipment without regard to the provisions of 40 U.S.C. 759:*
>
> . . . .

Pub.L. No. 94–440, 90 Stat. 1439, 1460 (1976) (emphasis added). While the underscored provision does not itself indicate whether it was restricted to fiscal year 1977, because it is contained in an appropriations act and because it is unaccompanied by words of futurity, we presume that it was. *United States v. Vulte,* 233 U.S. 509, 514–15, 34 S.Ct. 664, 666, 58 L.Ed. 1071 (1914); *see TVA v. Hill,* 437 U.S. 153, 189–90, 98 S.Ct. 2279, 2299–2300, 57 L.Ed.2d 117 (1978). Moreover, the phrases "for the current fiscal year" and "during the current fiscal year" precede the pertinent provision in the same paragraph; the former phrase, at least grammatically, appears to control the clause within which the exemption is contained. Had Congress intended to make the exemption permanent, it knew how: it could and we believe would have used words of futurity, like "[h]ereafter, notwithstanding any other provisions of

law ... ", a phrase appearing two paragraphs earlier that applies to other aspects of GPO's program. 90 Stat. at 1459.

The Public Printer himself agreed with this reading in 1977. That year, he returned to Congress to seek inclusion of the same exemption—with the sole but significant addition of the word "hereafter"—in the 1978 Legislative Branch Appropriations Act. *See Legislative Branch Appropriations for Fiscal Year 1978: Hearings Before a Subcomm. of the Comm. on Appropriations, House of Representatives,* 95th Cong., 1st Sess. 435, 437, 496 (1977); *Legislative Branch Appropriations for Fiscal Year 1978: Hearings Before a Subcomm. of the Comm. on Appropriations, United States Senate,* 95th Cong., 1st Sess. 416–17, 423 (1977). We agree with IBM that his request was denied, not because it was superfluous or based upon a misapprehension of the reach of the 1977 exemption, but because the committee considering the request had been reminded that the Brooks Act was intended to cover legislative agencies like GPO. *See Legislative Branch Appropriations for Fiscal Year 1978: Hearings Before a Subcomm. of the Comm. on Appropriations, House of Representatives,* 95th Cong., 1st Sess. 496–97 (1977). Congress could have agreed with GPO that the added costs and delays allegedly due to GSA involvement, *see* H.R.Rep. No. 94–1225, 94th Cong., 2d Sess. 31, 36, 42, were continuing but, nevertheless, declined to permanently exempt GPO from the Brooks Act to avoid potential waste and abuse in the procurement process, problems Congress considered more severe. *See generally Efforts By Federal Agencies to Circumvent the Competition in Contracting Act (Part 1), Hearings Before a Subcomm. on Gov't Operations, House of Representatives,* 99th Cong., 2d Sess. (1986) [hereinafter *Efforts to Circumvent* ].

We do not see that the source of the funds used to acquire ADPE—here the

---

* GPO does not challenge the board's conclusion that the Brooks Act "cut through" provision, 40 U.S.C. § 759(c)—"[n]o other provision of this Act or any other Act which is inconsistent with the provisions of this section shall be applicable in the administration of this section"—trumps GPO's exclusion from the Federal Property and Administrative Services Act of 1949, as amended (thus encompassing the Brooks Act), contained in 44 U.S.C. § 311 (1982 & Supp. V 1987).

GPO Revolving Fund, which is available without fiscal year limitation—affects the analysis. Congress did not consider the source of the funds relevant in determining the applicability of the Brooks Act; nor, for that reason, does the board. *See Rocky Mountain Trading Co.,* GSBCA No. 8958–P, 87–2 B.C.A. (CCH) ¶ 19,840, at 100,409, 1987 WL 40900 (1987). A contrary conclusion would allow agencies to escape the Act by the expedient of using funds from an appropriate source. Nor does the fact that GPO purchased ADPE with money from the revolving fund help it in the statutory interpretation argument. It is the nature of the exemption that is at issue here, not the nature of the funds available to exploit it. Coupling a transitory exemption with a continuing fund does not bestow on the former the character of the latter.

Finally, we disagree with GPO's assertion at argument that the 1986 amendments to the Brooks Act and the accompanying legislative history do not illuminate what Congress intended by its actions in 1977 and 1978. Congress adopted the amendments in response to our holding in *Electronic Data Sys. Fed. Corp. v. General Serv. Admin. Bd. of Contract Appeals,* 792 F.2d 1569, 1578 (Fed.Cir.1986), that the board had protest jurisdiction only over procurements actually "conducted under" the Brooks Act and not over those that should have been so conducted. In the Paperwork Reduction Reauthorization Act of 1986, Pub.L. No. 99–591, 100 Stat. 3341–35 (1986), Congress accepted our invitation to "change the way the statute is written", 792 F.2d at 1583, by extending the board's jurisdiction to those protests "subject to" the Brooks Act. 100 Stat. at 3341–44 (codified at 40 U.S.C. § 759(f)(1) (Supp. V 1987)).

It is true that neither this nor any of the other 1986 amendments to the Brooks Act specifically mentions GPO, but we will not assume that Congress was blind to the fact that *Electronic Data Systems* involved GPO. In that case, we had no doubt that GPO was "subject to" the Brooks Act, notwithstanding that the procurement there at issue was not "conducted under" it. 792 F.2d at 1577. There is no evidence that

Congress thought otherwise. *See Efforts to Circumvent* at 1–2 (statement of Congressman Brooks); *id.* at 33 (letter from Congressmen Brooks and Horton to Charles A. Bowsher, Comptroller General). Indeed, in *Electronic Data Systems* GPO itself did not raise the exemption argument it relies on here.

■ *B. Standing.* The Brooks Act empowers the board to hear protests of disappointed bidders who are "interested parties." 40 U.S.C. § 759(f)(1) (Supp. V 1987). An "interested party" is in turn defined as "an actual or prospective bidder or offeror whose *direct economic interest* would be affected by the award of the contract or by failure to award the contract." *Id.* § 759(f)(9)(B) (Supp. V 1987) (emphasis added). In contrast to statutes like the Administrative Procedure Act, under which Congress has extended the traditional basis for standing beyond direct economic injury, *see, e.g., Sierra Club v. Morton,* 405 U.S. 727, 734, 738 & n. 13, 92 S.Ct. 1361, 1365, 1367 & n. 13, 31 L.Ed.2d 636 (1972), and *Data Processing Serv. v. Camp,* 397 U.S. 150, 154, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970), in the Brooks Act Congress has deliberately and substantially narrowed the class of persons entitled to invoke the authority of the board.

GPO pursues two interrelated objections to IBM's standing, originally raised by Amdahl. The first focuses directly on the statutory requirement that IBM have a direct economic interest in the contract; the second addresses the statute indirectly, via the regulatory requirement of responsiveness. The board rejected both.

The first is that IBM could not receive the contract even if its protest were granted, because its bid ranked fourth-lowest in a formally-advertised sealed-bid procurement, it did not challenge either the solicitation itself or the eligibility of the intervening bidders, and all the bidders offered the identical CPU. IBM therefore had, at best, a trivial interest in the award. Citing the resources IBM had expended in attempting to secure the contract as well as GPO's failure both to reject IBM's bid and

to make a finding on the responsiveness of the intervening bids, the board summarily concluded that "IBM has a direct economic interest in the award." 89–1 B.C.A. (CCH) ¶ 21,367, at 107,704. In this, it erred.

The board was troubled by the "logic" that would allow the award of a questionable procurement to go unchallenged if the second-lowest bidder did not file a protest. It believed this result would be "contrary to the notions of full and open and fair and equal competition and would significantly undermine the integrity of the procurement and protest processes." *Id.* But, as the Supreme Court has said in an analogous context,

> [t]he requirement that a party seeking review must allege facts showing that he is himself adversely affected does not insulate executive action from judicial review, nor does it prevent any public interests from being protected through the judicial process. It does serve as at least a rough attempt to put the decision as to whether review will be sought in the hands of those who have a direct stake in the outcome.

*Sierra Club,* 405 U.S. at 740, 92 S.Ct. at 1368. Congress has decided that the coincidence of a disappointed bidder's "direct economic" interest with the public interest adequately accommodates both. By striking a different balance more solicitous of the latter, the board has upset this congressional scheme. Congress simply did not intend for the board to entertain the protests of innumerable disappointed bidders who have little or no chance of receiving the contract.

In this case, GPO made a responsiveness determination only for Amdahl's bid. Under the board's rationale, each of the nine disappointed bidders has standing to protest the award to Amdahl because each "expended resources in an effort to obtain the contract", each could allege that GPO violated the terms of the solicitation, and each could seek reprocurement as a remedy. Indeed, if there were nineteen or ninety bidders, the result would be the same. We think this result is contrary to the command of the statute, which restricts the

right to file a protest before the board to those parties with a "direct economic interest" in the award of the contract. *See* 40 U.S.C. § 759(f)(9)(B) (Supp. V 1987). The board effectively reads this limitation out of the statute by trivializing the interest it deems sufficiently direct.

■ Where, as here, every disappointed bidder on a formally-advertised sealed-bid procurement offers essentially the same package of products and services, the bids materially differ only as to price, the solicitation itself is not challenged, and there is no reason to believe that the second-lowest bid is not responsive, only the second-lowest bidder has a direct economic interest in the award of the contract. Therefore, only the second-lowest bidder is an interested party entitled to protest the award of the contract, 40 U.S.C. § 759(f)(9)(B) (Supp. V 1987), because only it stands to receive the contract in lieu of the challenged awardee. The speculative prospect of cancellation of the solicitation and initiation of a new one is insufficient to suffuse all other bidders with the requisite interest to support standing. This is especially so when the solicitation invites sealed bids: after bids have been opened and made public, cancellation can occur only for compelling reasons. United States Government Printing Office, *Printing Procurement Regulation,* Ch. IV, § 2 (1980). *See Prineville Sawmill Co., Inc. v. United States,* 859 F.2d 905, 912 (Fed.Cir.1988); *Massman Const. Co. v. United States,* 60 F.Supp. 635, 643, 102 Ct.Cl. 699 (1945); 48 C.F.R. § 14.404–1 (1988) (similar "compelling reason" requirement before executive agencies may cancel solicitations after bid opening).

By restricting the class of eligible protesters to those with a direct economic interest in the award, Congress deliberately relied on the mechanism of economic self-interest to police agencies' conduct of ADPE procurements. IBM cannot protest as a "private attorney general enforcing the public interest in the proper application of the procurement statutes and regulations," *Julie Research Laboratories, Inc.,* GSBCA No. 8070–P–R, 86–2 B.C.A. (CCH)

¶ 18,881, at 95,237 (1986), simply because it thinks Congress' enforcement mechanism is less comprehensive than it should be.

There is nothing startling in this. The Comptroller General interprets 31 U.S.C. § 3551(2), which contains the identical "interested party" requirement for bringing a Brooks Act protest before the General Accounting Office, the same way. *See, e.g., Eastman Kodak Co.,* Comp.Gen.Dec. B–220646, 86–1 C.P.D. ¶ 113 (Jan. 31, 1986); *Alfa–Laval, Inc.,* Comp.Gen.Dec. B–224330, 86–2 C.P.D. ¶ 520 (Nov. 5, 1986); *First Fed. Data Serv. Co.,* Comp.Gen.Dec. B–224183.2, 87–1 C.P.D. ¶ 179 (Feb. 18, 1987); *Discount Mach. and Equip., Inc.,* Comp.Gen.Dec. B–230721, 88–1 C.P.D. ¶ 550 (June 9, 1988). So, too, does the board itself from time to time. *See, e.g., SDA Fed. Sys., Inc.,* GSBCA No. 8180–P, 85–3 B.C.A. (CCH) ¶ 18,492 (1985); *but see Wisconsin Physicians Serv. Ins. Corp.,* GSBCA No. 9674–P, 89–1 B.C.A. (CCH) ¶ 21,284 (1988).

■ Amdahl also argued to the board that IBM did not have standing because its bid was nonresponsive on its face: the bid contained a restrictive legend which made it per se nonresponsive under applicable procurement regulations. *See* 48 C.F.R. § 14.404–4 (1988). The board dismissed this argument as irrelevant to the standing inquiry:

> Where a bidder has not been eliminated from the competition by the agency during the course of the procurement, we will not remove that bidder when it brings a protest. Absent a prior decision by a contracting officer, Board consideration of a potentially protestable issue (such as whether a bid is responsive to the solicitation) is premature. [89–1 B.C.A. (CCH) ¶ 21,372, at 107,718.]

We have suggested above that Congress intended the phrase "interested party" to be a meaningful limitation on the authority of the board to entertain, and this court to review, protests of an agency's conduct of a Brooks Act procurement. We see responsiveness as another facet of the interested party inquiry. When responsiveness is an issue, it must be resolved before the board can proceed. If a bid is not responsive, the protester has no more right to invoke the office of the board than the proverbial man on the street. A nonresponsive bidder is the epitome of one who lacks a direct economic interest. This is not a mere technicality; it is the predicate for the board's right to intervene in governmental procurements. A bidder's standing to protest a contract given to another cannot be divorced from the responsiveness of its offer.

Suppose, in this case, the solicitation had not been amended and GPO had invited bids only on the IBM 3084 Model QX6 or IBM 3084 Model Q64 "or equal" non-air cooled CPU. If Amdahl had nevertheless bid its air cooled CPU, the 5880, would the board have been obliged to hear its protest simply because the contracting officer had awarded the contract to IBM or to some other vendor offering an "equal" non-air cooled CPU and, therefore, never had occasion to formally address the responsiveness of Amdahl's bid? We think not. The Board must exercise its authority to determine which parties are sufficiently "interested" to have standing before entertaining a potentially unnecessary proceeding with its attendant costs and delay.

Again, the board has recognized this principle in other cases. For instance, in *Micro Star Co., Inc.,* GSBCA No. 9824–P, 89–1 B.C.A. (CCH) ¶ 21,511 (1989), the board made a determination of nonresponsiveness when an agency had not done so and, on that basis, dismissed a protest for lack of an interested party. It also dismissed a protest for lack of an interested party on the basis of an agency determination of nonresponsiveness in *North Am. Automated Sys., Inc.,* GSBCA No. 9813–P, 89–1 B.C.A. (CCH) ¶ 21,532 (1989). However, in light of our conclusion that IBM lacks standing because of its fourth remove from the award of the contract, we need not remand for consideration of the responsiveness question.

### Conclusion

Accordingly, the decision of the board is affirmed to the extent that it found juris-

diction to hear protests to GPO's conduct of this procurement, it is reversed to the extent that it held IBM has standing, and it is vacated to the extent it addressed the merits of IBM's protest.

### COSTS

No costs.

AFFIRMED–IN–PART, REVERSED–IN–PART, AND VACATED–IN–PART.

