**CHE CONSULTING, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant,**

and

**Storage Technology Corporation, Defendant–Intervenor.**

No. 99–760 C.

United States Court of Federal Claims.

Aug. 7, 2000 [1].

1. This opinion was issued under seal on July 20, 2000. Pursuant to ¶ 2 of the ordering language, the parties were instructed to identify protected/privileged material subject to deletion. No deletions were requested or (except for ¶ 2 of the ordering language) made.

**332**

L. James D'Agostino, McLean, VA, for Plaintiff. James P. Gallatin, Jr., Richard L. Moorhouse, Andrew J. Hungerman IV, and Jason P. Matechak, Washington, DC, of counsel.

Wanda Rubianes–Collazo, with whom were David W. Ogden, Acting Assistant Attorney General, David M. Cohen, Director, James M. Kinsella, Deputy Director, Department of Justice, Washington, DC, for Defendant.

David S. Cohen, Washington, DC, for Defendant-Intervenor. John J. O'Brien and Rowena E. Laxa, Washington, DC, of counsel.

2. *See infra* n. 4.

3. DISA WESTHEM was created on October 1, 1994, to be the preeminent provider of informa-

## OPINION AND ORDER

HEWITT, Judge.

This post-award bid protest action comes before the court on defendant's and intervenor's motions to dismiss, as well as the parties' cross motions for judgment on the administrative record. Plaintiff, CHE Consulting, Inc. (CHE), protests the decision of Defense Information Technology Contracting Organization (DITCO) to issue orders pursuant to a Blanket Purchase Agreement (BPA) to Storage Technology Corporation (StorageTek) for information technology maintenance services under StorageTek's Federal Supply Schedule (FSS) contract with the General Services Administration (GSA). *See* Complaint (Compl.) at pp. 1–2.

CHE challenges the BPA on the grounds that the BPA's terms and conditions are outside the scope of the underlying FSS contract and therefore violate the Competition in Contracting Act of 1984 (CICA), 10 U.S.C. § 2304(a)(1)(A).

For the following reasons, the court denies the protest.

### I. Background

The following facts are taken from the Administrative Record (AR) filed by defendant on September 28, 1999. No facts relevant to the court's determination in this matter are in dispute.[2]

DITCO issued BPA No. DCA 200–99–A– 0001 as part of its ongoing efforts to establish a comprehensive hardware maintenance management program for the information technology systems in place throughout the Defense Information Systems Agency (DISA), Western Hemisphere (WESTHEM).[3] AR at 5, 531. DITCO is the contract administration arm of DISA. DISA WESTHEM consists of five Mainframe Processing Centers, Regional Support Activities, and supported remote sites. AR at 523. From its various facilities, DISA WESTHEM provides information technology and processing support to military departments and defense

tion systems support, under conditions of both war and peace, to warfighters and others as required by the Department of Defense. AR at 5.

agencies supporting military departments. AR at 523.

In early 1999, DISA WESTHEM began to implement an acquisition plan for consolidated hardware maintenance. The objective of DISA's plan for consolidated hardware maintenance is to eliminate the multiplicity of contracting actions that were being used to obtain maintenance services for DISA WESTHEM equipment and thereby "obtain economies of scale, reduce maintenance costs, assure required maintenance services are in place, and provide consistent hardware maintenance performance at all locations." AR at 5.

The acquisition plan described the maintenance services sought by DISA WESTHEM and established a minimum, mandatory requirement that the contractor utilize "maintenance/software diagnostic routines for hardware, both on-line and off-line for predictive maintenance and problem definition." AR at 7. "Diagnostic" software refers to "software programs that test, evaluate, and fault-isolate components and functions of ADPE [automated data processing equipment] hardware." AR at 532. "Predictive maintenance" refers to the "monitor[ing][of] equipment/component performance using diagnostics defined in [the BPA] for the purpose of identifying whether equipment is operating in accordance with established specifications." AR at 538. Under the "predictive maintenance" requirements, "[t]he contractor shall, upon determining that an equipment/component is about to fail or is operating outside OEM specifications, initiate action to effect repair...." AR at 538.

Because of the proprietary nature of the diagnostic software required for predictive maintenance, some Original Equipment Man-

ufacturers (OEMs) were reluctant to establish working relationships with third-party maintenance providers. AR at 11. DISA therefore determined that only OEMs or vendors with written OEM support agreements could reliably provide the specific services required, AR at 11, 523, and decided to procure hardware maintenance services through BPAs placed under the Federal Supply Schedules. AR at 10.

On August 3, 1999, the BPA that is the subject of this lawsuit was issued to StorageTek as the OEM for all of DISA WESTHEM equipment that requires StorageTek proprietary diagnostic software for predictive maintenance. AR at 523–24. (Older generation, stand-alone StorageTek equipment continues to be serviced by third-party maintenance providers. AR at 524.) DITCO anticipates that the BPA will result in a net savings to the government of approximately $55,116 per month. AR at 525A.

Prior to implementation of the consolidation plan, CHE had provided computer maintenance services for some of the StorageTek equipment under DITCO contracts as a subcontractor. However, CHE is neither the OEM of any of the equipment serviced through this BPA, nor a vendor with a written OEM support agreement, as required by the contract. *See* JSF ¶ 12.[4] *See also* AR at 7–8, 523. Thus, CHE does not possess authorized copies of StorageTek's proprietary diagnostic software required to offer a level of service that would allow CHE to predict and prevent failure of the equipment included in the BPA, before such failure occurs. *Id.* ¶ 34.[5] Furthermore, CHE did not have an FSS contract and therefore was not considered for award at the time that the BPA was being negotiated with StorageTek. *Id.* ¶ 25. StorageTek holds FSS contract No.

---

4. JSF refers to the Joint Statement of Facts by Defendant and Intervenor filed under seal before this Court on November 17, 1999. CHE did not present any contrary evidence concerning its lack of OEM status and thus the court accepts the JSF statements regarding CHE's lack of OEM status as true. *See* Plaintiff's Counter–Statement of Facts in Opposition to Defendant and Intervenor's Respective Motions to Dismiss and Motions for Judgment on the Administrative Record (P's Counter–Statement); Transcript of Oral Argument on Feb. 25, 2000(Tr.) at 72.

5. In its Counter–Statement, plaintiff responds that it is capable of providing the type of predictive maintenance required by DISA, regardless of the fact that it does not possess copies of the diagnostic software. *See* P's Counter–Statement ¶¶ 8–9; Tr. at 78. The real issue, however, which remains unchallenged, is plaintiff's inability to satisfy the OEM requirement.

GS–35F–5049H, the schedule contract underlying the BPA in this case. JSF ¶ 27; AR at 586–659.

CHE's complaint alleges that the terms of the BPA are outside the scope of StorageTek's FSS contract, making the BPA unlawful. Compl. at pp. 1–2. Plaintiff's complaint states as follows:

Count I (Circumvention and Violation of CICA [Competition in Contracting Act])

. . . .

The alteration, deviations and tailoring of the Contract by the BPA terms, conditions and SOW [statement of work] amounts to the creation of a new contract not contemplated by the terms of the FSS Contract or the applicable statutes and regulations.

Count II (Failure to Synopsize Procurement Action)

. . . .

Since the Orders are not within the scope of the Contract, the Defendant was obligated to synopsize the procurement action taken by DISA prior to award of the Orders to StorageTek.

. . . .

Count III (No Justification And Approval For Other Than Competitive Procedures)

. . . .

Since the Orders are not within the scope of the Contract, the Defendant was obligated to either (1) utilize competitive procedures for the procurement or (2) certify that the use of other than competitive procedures was justified and approved pursuant to the applicable laws and regulations.

. . . .

Count IV (Breach Of Implied Duty of Good Faith)

. . . .

Defendant's use of an unlawful BPA to circumvent CICA and exclude Plaintiff from offering services to DISA was a breach of Defendant's implied duty to deal fairly with Plaintiff.

Compl. ¶¶ 46, 53, 57, 64.

## II. Discussion

On November 12, 1999, defendant and intervenor filed motions to dismiss the complaint under RCFC 12(b)(1) arguing that the court lacks subject matter jurisdiction to entertain CHE's lawsuit because CHE is not an "interested party" under the 1996 amendments to the Tucker Act. *See* 28 U.S.C. § 1491(b)(1) (1994); Defendant's Motion to Dismiss (D's MTD) at 13–18; Intervenor's Motion to Dismiss (I's MTD) at 8–11. Defendant also argues that the complaint should be dismissed under RCFC 12(b)(4) because CHE failed to state a claim upon which relief can be granted. *See* D's MTD at 1–2. In the alternative, both defendant and intervenor request judgment upon the administrative record pursuant to RCFC 56.1. *See id.;* I's MTD at 1. On December 3, 1999, plaintiff filed an opposition to defendant's and intervenor's motions, as well as a cross-motion for judgment on the administrative record (P's Opposition). Oral argument was heard on February 25, 2000. Additional briefing by all parties was completed on June 16, 2000.

The Supreme Court restated in *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94–95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998), that determining whether subject matter jurisdiction exists is an "inflexible" threshold matter. Accordingly, this court addresses the jurisdiction issue first.

A. Motion to Dismiss for Lack of Subject Matter Jurisdiction Under RCFC 12(b)(1)

Whether a court possesses subject matter jurisdiction over a claim depends upon the "court's general power to adjudicate in specific areas of substantive law." *Palmer v. United States,* 168 F.3d 1310, 1313 (Fed.Cir. 1999). In deciding a motion to dismiss, the court will construe the facts alleged in the complaint in the light most favorable to the plaintiff. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The court may accept undisputed factual allegations as true and correct. *See Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 747 (Fed.Cir.1988). Where the party moving for dismissal attacks the truthfulness of the pleader's factual assertions, the court will not presume that these facts are true, and the court will determine for itself the merits of the jurisdictional claims. *See id.; see also*

*Maniere v. United States,* 31 Fed.Cl. 410, 414 (1994); *Mark Smith Constr. Co. v. United States,* 10 Cl.Ct. 540, 541 n. 1 (1986).

Ultimately, the burden of establishing the court's subject matter jurisdiction by a preponderance of the evidence is on the plaintiff. *See Cedars–Sinai Med. Ctr. v. Watkins,* 11 F.3d 1573, 1583 (Fed.Cir.1993); *Reynolds,* 846 F.2d at 748; *Maniere,* 31 Fed.Cl. at 413. The court should not grant a motion to dismiss, "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). "[C]onclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss." *Briscoe v. LaHue,* 663 F.2d 713, 723 (7th Cir.1981), *aff'd,* (460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983)).

### B. CHE's Status as an Interested Party Under 28 U.S.C. § 1491(b)(1)

The Administrative Dispute Resolution Act of 1996, Pub.L. No. 104–320, § 12, 110 Stat. 3870, 3874–75, amended the Tucker Act, 28 U.S.C. § 1491, to provide the United States Court of Federal Claims with post-award bid protest jurisdiction over federal procurements, concurrent with that of federal district courts, for actions filed on or after December 31, 1996. *See* 28 U.S.C. § 1491(b)(1-4) (Supp. III 1997); *GraphicData, LLC v. United States,* 37 Fed.Cl. 771, 778 (1997); *Cincom Sys., Inc. v. United States,* 37 Fed. Cl. 663, 669 (1997); *Cubic Applications, Inc. v. United States,* 37 Fed.Cl. 339, 341 (1997).

The relevant portion of the Administrative Dispute Resolution Act (ADRA) states:

Both the Unite[d] States Court of Federal Claims and the district courts of the United States shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. Both the United States Court of Federal Claims and the district courts of the United States shall have jur-

isdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded. 28 U.S.C. § 1491(b)(1).

In this case, defendant and intervenor assert that CHE lacks standing to protest the BPA because CHE is not an "interested party" under 28 U.S.C. § 1491(b)(1). As this court has often noted, § 1491(b)(1) does not define the term, "interested party." *See Cubic Defense Sys., Inc. v. United States,* 45 Fed.Cl. 239, 246–47 (1999); *C C Distribs., Inc. v. United States,* 38 Fed.Cl. 771, 777 (1997); *ATA Defense Indus., Inc. v. United States,* 38 Fed.Cl. 489, 494 (1997). To determine whether CHE is an interested party with standing to challenge this procurement, the court examines the issue under the several standing tests applied by this court under its bid protest jurisdiction.

**1. CHE is Not an "Actual or Prospective Bidder or Offeror Whose Direct Economic Interest Would be Affected by the Award of the Contract or by Failure to Award the Contract"**

 Defendant and intervenor have requested this court to adopt the definition Congress instructed the General Accounting Office (GAO) to employ in its bid-protest jurisdiction: "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract." D's MTD at 15; I's MTD at 8. *See* 31 U.S.C. § 3551(2) (Supp. III 1997). Defendant argues that CHE does not meet the threshold requirement for an "interested party," under the GAO approach, because CHE lacks an FSS contract and therefore has never had an expectation that DITCO could award CHE the BPA at issue in this case. A substantially identical argument was previously considered and rejected by this court in *ATA Defense Indus., Inc. v. United States,* 38 Fed. Cl. 489 (1997).

The court stated in *ATA* that "there is no indication in the wording of Section 3551(2) [the GAO statute] that Congress intended to ... exclude from the scope of 'prospective bidders' those parties that intended to present a bid but were prevented from doing so

in violation of controlling statutes and regulations." *ATA*, 38 Fed.Cl. at 495. Under the circumstances of this case, we likewise reject defendant's argument based on § 3551(2), even though this court finds plaintiff is not an "interested party" on other grounds. The court does not determine that CHE lacks standing to challenge the issuance of orders pursuant to the BPA at issue in this matter based solely on CHE's lack of an FSS contract. Here, CHE's lack of an FSS contract and CHE's failure to meet the requirements of the contract together serve as the basis for the court's decision.

In *ATA*, the government argued that the plaintiff, as a non-schedule contractor, lacked standing to challenge an FSS contract. *Id.* at 495. The purchase order contract at issue in that case covered the upgrading of two target ranges at Fort Stewart, Georgia. *Id.* at 491–92. The contracting officer decided to limit his search for potential suppliers to those with FSS agreements. *Id.* at 492. Even though ATA was a competitor of the awardee in the sale of products and services used in upgrading target ranges for the Army, ATA was not listed on the Federal Supply Schedule. *Id.* The challenged contract listed separately the prices for the different products and services required for the upgrades. *Id.* The court in *ATA* was troubled by the fact that 35% of the products listed on the purchase order were not covered in the existing FSS contract. *Id.* at 504–05.

The plaintiff in *ATA* had a much stronger argument for standing than CHE. The only bar against ATA's successfully competing for the procurement was lack of a schedule contract. This was significant especially in light of the court's finding in *ATA* that 35% of the products on the challenged purchase order could not have been procured under the FSS contract in the first place and should have been subject to competition. Faced with a significant CICA violation, the court found that ATA had interested party status.[6] In finding that ATA was an interested party,

the court relied upon several facts—that ATA expressed its intent to bid on the contract work, that ATA was precluded from bidding in violation of controlling statutes and regulations, and that ATA would have prevailed in the competitive process had it been allowed to bid. *Id.* at 495–97.

*ATA* is distinguishable from the matter now before the court. Unlike the plaintiff in *ATA*, CHE would not have prevailed in the competitive process even if it had been allowed to bid. As intervenor correctly pointed out during oral argument, CHE must overcome two bars before it can prevail in this procurement. *See* Transcript of Oral Argument on Feb. 25, 2000(Tr.) at 54–61. The first bar, as discussed, is plaintiff's status as a non-schedule contractor challenging a procurement from a Federal Supply Schedule. However, the fatal bar for CHE is the fact that CHE is not the OEM of StorageTek's equipment and lacks a support agreement with the OEM. The government's decision here to require OEM maintenance for equipment serviced under the BPA makes CHE ineligible for the challenged procurement regardless of the procurement vehicle used. At no time has CHE challenged the correctness of the government's decision to require that only OEMs or vendors with OEM support agreements provide maintenance.

The court finds CHE's position similar to that of the plaintiff in *Ryan Co. v. United States*, 43 Fed.Cl. 646 (1999) rather than that of the plaintiff in *ATA*. In the *Ryan* case, the contracting officer concluded that Ryan, who had submitted the lowest priced bid, was nonresponsive due to its failure to submit manufacturer's catalog cuts. *Id.* at 649. Ryan filed a bid protest with GAO claiming that NASA erroneously determined that plaintiff's bid was nonresponsive. *Id.* at 649–50. GAO dismissed plaintiff's protest as premature because NASA had not issued a final decision regarding the responsiveness of plaintiff's bid. *Id.* at 650. Upon request

---

**6.** The court in *ATA* did not resolve whether Congress intended the term "interested party" in 28 U.S.C.A. § 1491(b) to be defined as in other statutes since it found that ATA qualified as an "interested party" even under the arguably more narrow GAO definition set forth in § 3551(2) in that ATA was a "prospective bidder ... whose direct economic interest would be affected by the award of the contract." *ATA*, 38 Fed.Cl. at 494.

from NASA, however, a GAO attorney-advisor issued an oral advisory opinion that plaintiff's bid was nonresponsive for failure to submit the necessary catalog cuts. *Id.* NASA subsequently rejected plaintiff's bid as nonresponsive, and Ryan filed a bid protest in this court seeking injunctive and declaratory relief, including termination of the award, the conduct of a preaward survey to determine if Ryan was responsive, and if Ryan were determined to be responsive, the award of the contract to Ryan. *Id.* The *Ryan* court found plaintiff's bid to be nonresponsive and recognized that the descriptive literature requirement is a matter of responsiveness when used for the purpose of bid evaluation. *Id.* at 661.

A nonresponsive bidder is not an interested party. *See id.* at 656. A bid by CHE would have been nonresponsive even if the government had decided against procuring hardware maintenance services under an FSS contract, and issued instead an Invitation for Bids (IFB). A bid by CHE would still have been nonresponsive due to the mandatory OEM requirement.

In reaching its conclusion, the *Ryan* court cited the Federal Circuit's decisions in *United States v. IBM Corp.*, 892 F.2d 1006 (Fed. Cir.1989) and *MCI Telecommunications Corp. v. United States*, 878 F.2d 362 (Fed. Cir.1989), which addressed the bid protest jurisdiction of the General Services Board of Contract Appeals, (GSBCA) under the now-repealed Brooks Act.[7] The rationale of the *IBM* decision is instructive in considering CHE's claim.

In *IBM*, the plaintiff, as the fourth lowest bidder, filed a protest challenging the award of a contract for automated data processing equipment. The GSBCA held that IBM was an "interested party" under the Brooks Act. The Federal Circuit reversed this decision.[8] The Federal Circuit found that the words "interested party" constituted "a meaningful limitation on the authority of the [GSBCA] to entertain, and this court to review, protests

of an agency's conduct." *IBM*, 892 F.2d at 1012. The IBM court held that a "nonresponsive bidder" was not an "interested party" within the meaning of the Brooks Act, stating:

> We see responsiveness as another facet of the interested party inquiry. When responsiveness is an issue, it must be resolved before the board can proceed. If a bid is not responsive, the protester has no more right to invoke the office of the board than the proverbial man on the street. A nonresponsive bidder is the epitome of one who lacks a direct economic interest. This is not a mere technicality; it is the predicate for the board's right to intervene in governmental procurements. A bidder's standing to protest a contract given to another cannot be divorced from the responsiveness of its offer.

*Id. See also Ryan*, 43 Fed.Cl. at 656 (citing *Protests of Rocky Mountain Trading Co. Sys. Div.*, 90–2 B.C.A. ¶ 22,739 (1990))(relying on IBM in its conclusion that a nonresponsive bidder cannot raise the question of the responsiveness of the awardee's successful bid); *RRRS Enters., Inc.*, 91–1 CPD ¶ 551 (1991)(holding that a nonresponsive bidder is not an "interested party" within the meaning of 31 U.S.C. § 3551(2)).

The *IBM* decision plainly instructs that the phrase "interested party" does not include a party that makes a nonresponsive bid. A nonresponsive bidder is no different than the "proverbial man on the street." *IBM*, 892 F.2d at 1012. *See also Ryan*, 43 Fed.Cl. at 656. As a nonresponsive bidder, CHE lacks a direct economic interest. *See Ryan* 43 Fed.Cl. at 657.

Although this court has often applied the definition of interested party contained in the statute conferring bid protest jurisdiction on the GAO, 31 U.S.C. § 3551(2), there are textual differences between that statute and the ADRA amendments to the Tucker Act conferring post-award bid protest jurisdiction on this court. *Compare* 31 U.S.C. § 3551(1)

---

7. In 1996, 40 U.S.C. § 759, which included the GSBCA's bid protest jurisdiction regarding automated data processing equipment, was repealed. *See* Pub.L. No. 104–106, § 5101, 110 Stat. 680 (1996).

8. The definition of "interested party" for the purposes of GSBCA Brooks Act protests was the same as the definition in 31 U.S.C. § 3551(2).

*with* 28 U.S.C. § 1491(b)(1). The issue of standing as it relates to post-award bid protests should therefore also be examined in the context of the particular statute granting this court post award bid protest jurisdiction. *See CCL, Inc. v. United States,* 39 Fed.Cl. 780, 789 (1997).

The GAO statute limits the phrase "interested party" to use in connection with contracts, solicitations, or requests for offers. 31 U.S.C. § 3551(1)(A-D). The language of the ADRA is not so limited. The ADRA contemplates a situation where a plaintiff alleges a violation of statute or regulation "in connection with a procurement or a proposed procurement" in circumstances that do not, by the terms of the statute, require there to be a contract, solicitation, or request for offer. *See* 28 U.S.C. § 1491(b)(1); *CCL,* 39 Fed.Cl. at 789–90. The differences between these two statutes are significant enough that the court should not leap to a conclusion that standing under the ADRA is identical to the GAO definition of "interested party." *See American Fed'n of Gov't Employees, AFL–CIO (AFGE) v. United States,* 46 Fed.Cl. 586, 592 n.12 (2000).

2. CHE is Unable to Establish Standing under the Administrative Procedure Act

■ Recently, after a comprehensive examination of the language and legislative history of the ADRA, this court concluded that our bid protest jurisdiction now includes the full range of bid protest cases previously subject to review in either the Court of Federal Claims or the district courts. *See AFGE,* 46 Fed.Cl. at 593–95. Based on a convincing analysis, the court determined in *AFGE* that the test applied by the district courts under the Administrative Procedure Act (APA) is appropriate for determining interested party status under the ADRA. *See id.* at 595. We therefore examine whether CHE is able to establish jurisdiction based upon the definition of interested party under the APA as applied to post-award bid protest cases in the district courts.

Congress, through the ADRA, extended to this court jurisdiction to hear claims brought by a "person ... adversely affected or aggrieved by agency action within the meaning of a relevant statute," 5 U.S.C. § 702, there-

by vesting this court with jurisdiction to hear challenges to procurement decisions "previously heard exclusively in the federal district courts" by persons who would have had standing in federal district court under the APA to make such a challenge. *AFGE,* 46 Fed.Cl. at 594–95. Under the APA approach, the Supreme Court has determined that claimants challenging a procurement must show "sufficient injury-in-fact" and that " 'the interest sought to be protected by the complainant [must be] arguably within the zone of interests to be protected or regulated by the statute ... in question.' " *National Credit Union Admin. v. First Nat'l Bank & Trust Co.,* 522 U.S. 479, 488, 118 S.Ct. 927, 140 L.Ed.2d 1 (1998) (quoting *Association of Data Processing Serv. Orgs. v. Camp,* 397 U.S. 150, 152–53, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970)). *See also AFGE,* 46 Fed.Cl. at 595.

Accordingly, the court examines the requirements for establishing standing under the APA and whether or not plaintiff here has met those requirements. The first requirement is that plaintiff must have "suffered sufficient 'injury-in-fact.' " *AFGE,* 46 Fed.Cl. at 595. Plaintiff contends that "as the incumbent subcontractor under the previous award and the successful offeror under the most recent full and open competition for this requirement, [plaintiff] has been denied the opportunity to compete and has lost a viable economic contracting vehicle and the revenue stream flowing therefrom." Plaintiff's Supplemental Brief Regarding Standing (P's Supp.) at 6. Intervenor counters this by stating that "CHE has suffered no injury-in-fact because it was not eligible for award of the work under the StorageTek BPA in the first place." Intervenor Storage Technology Corporation's Memorandum of Points and Authorities on Plaintiff CHE Consulting Inc.'s Standing (I's Supp.) at 5. Defendant and intervenor contend that CHE's lack of OEM status and an OEM support agreement preclude it from being able to compete for the contract. *Id.* at 5–6. *See also* Defendant's Motion in Compliance with the Court's Order of June 5, 2000 (D's Supp.) at 4.

Economic injury, such as the loss of future profits, constitutes an injury under the APA

test. *See Data Processing Serv. v. Camp,* 397 U.S. 150, 154, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *W.B. Fishburn Cleaners, Inc. v. Army & Air Force Exch. Serv.,* 374 F.Supp. 162, 165 (N.D.Tex.1974). As a result of defendant's award of the BPA contract at issue to StorageTek, the court is satisfied that CHE has suffered "sufficient injury-in-fact." Because CHE had previously performed "similar DISA work" as a subcontractor, P's Opposition at 9; Complaint at 2; P's Supp. at 6, CHE has lost a potential source of revenue as a result of the award of the disputed contract to StorageTek.

The second standing requirement under the APA requires plaintiff to show "that the injury is 'fairly traceable' to the agency's decision and is 'likely to be redressed by a favorable decision.'" *AFGE,* 46 Fed.Cl. at 595. In support of its position, CHE asserts that its injury resulted from the government's unlawful circumvention of the CICA. P's Supp. at 6. CHE further asserts that if the court were to determine that defendant's issuance of the BPA orders was in violation of the CICA, a possible remedy would involve a full and open competition under which CHE would be able to compete. *See id.* at 7. Defendant and intervenor again assert that because of its lack of OEM status or an agreement with the OEM, plaintiff is unable to establish standing under this prong of the APA standing test. *See* I's Supp. at 5; D's Supp. at 5. Defendant also points to CHE's lack of an FSS contract as fatal to its claim under this prong. *See* D's Supp. at 4–5.

CHE is unable to establish that its injury is likely to be redressed by a favorable decision in this matter. Indeed, because a bid from CHE would have been nonresponsive, the chance that CHE would be a winning offeror if the protest were sustained is not only not likely, it is remote. CHE has not challenged the legitimacy of the OEM requirement in the procurement at issue. Tr. at 76–78. In fact, the only response offered by CHE in defense of its position to challenge the procurement relates to its past-performance as the "former incumbent subcontractor and the successful offeror under the now-canceled previous full and open competitive procurement for this requirement."

P.'s Supp. at 3. *See also* Tr. at 77–79. Without more, plaintiff fails to carry its burden of establishing that, if given the opportunity to bid on the contract, its injury is likely to be redressed by sustaining the protest. *See United States v. IBM Corp.,* 892 F.2d 1006, 1012 (Fed.Cir.1989). In light of the BPA's OEM requirement, even if the court were to direct defendant to conduct a new procurement, plaintiff would remain ineligible to compete. Accordingly, plaintiff is unable to establish that the injury it has suffered is "likely to be redressed by a favorable decision." *AFGE,* 46 Fed.Cl. at 595.

In order for plaintiff's interests to satisfy the third requirement of APA standing, plaintiff must "establish that the injury [it] complains of ... falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 883, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990); *see also Bennett v. Spear,* 520 U.S. 154, 176, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). An interest falls within the "zone of interests" when there is "an 'unmistakable link' between a statute's purpose and the interests advanced by the plaintiff." *American Fed'n of Gov't Employees v. Cohen,* 171 F.3d at 460, 469 (7th Cir.1999). Plaintiff alleges that "unlike the *AFGE* Plaintiff's status under the FAIR [Federal Activities Inventory Reform] Act, it cannot be disputed that promoting competition is certainly one of the interests within the zone of interests to be protected by CICA." P's Supp. at 7. The court agrees that competition is an interest sought to be protected by the Competition in Contracting Act. The language of CICA itself states that competitive procedures shall be used to obtain "full and open competition." 10 U.S.C. § 2304(a)(1)(A). What plaintiff fails to allege in this case—including in its supplemental brief—is an interest of its own that would be vindicated by a finding of a violation of CICA in this procurement. Based on plaintiff's complaint and supplemental brief, the court understands plaintiff's interest to be the opportunity to bid on the disputed procurement. *See* Complaint at 2; P's Supp. at 3. Terminating this procurement because of an alleged violation of CICA would not provide

plaintiff with that competitive opportunity because plaintiff does not satisfy (and has not challenged) defendant's OEM requirement. Plaintiff has failed to show how its interest in being the successful bidder would be protected by CICA in this case. Accordingly, plaintiff fails to establish the third requirement of the APA standing test.

III. Conclusion

Based on the foregoing, the court concludes that CHE has failed to demonstrate that it is an interested party under the ADRA. Accordingly, it is ORDERED as follows:

1. Defendant's and Intervenor's Motions to Dismiss under RCFC 12(b)(1) are GRANTED. Plaintiff's Motion for Summary Judgment is DENIED. The Clerk of the Court shall enter judgment for Defendant and Intervenor.

2. Each party shall bear its own costs.

IT IS SO ORDERED.